JUN 20 2023 AM 11:39
FILED - USDC - BPT - CT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CHRISTINE WITTHOHN and
JEFFREY V. MEHALIC,

      Plaintiffs,

v.                                 CIVIL ACTION NO. 3:23cv774

DON WINSLOW and
ELAINE WINSLOW,

      Defendants.

## COMPLAINT

### Parties, Jurisdiction, and Venue

1.     Plaintiff Christine Witthohn is a citizen and resident of Stratford, Fairfield County, Connecticut.

2.     Plaintiff Jeffrey V. Mehalic is a citizen and resident of Stratford, Fairfield County, Connecticut.

3.     Defendant Don Winslow is a citizen and resident of Bush, St. Tammany Parish, Louisiana.

4.     Defendant Elaine Winslow is a citizen and resident of Bush, St. Tammany Parish, Louisiana.

5.     Jurisdiction is proper with this Court under 28 U.S.C. § 1332.

6.  Venue is proper with this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the action occurred in this judicial district or a substantial part of property that is the subject of the action is situated in this district.

**Facts**

7.  On or around January 7, 2020, Defendants purchased a residential property located at 424 Park Boulevard, Stratford, Connecticut ("the House") for $925,000.

8.  The House is a four-bedroom, four and one-half bath home built in 1963 and located in the Lordship section of Stratford.

9.  On or around October 30, 2021, Defendants listed the House online for rent.

10. Plaintiffs are informed and believe that Defendants formerly owned or currently own multiple properties in Connecticut and Louisiana, including low-income properties or subsidized housing.

11. In November 2021, Witthohn contacted Defendant Elaine Winslow ("Elaine") about possibly renting the House.

12. Elaine represented to Witthohn that the House was in excellent condition.

13. Elaine explained to Witthohn that the House was her "dream home," and that she and her husband, Defendant Don Winslow ("Don"), had

purchased it with the intention to move in, but that she had sustained some injuries that prevented them from doing so.

14. Elaine informed Witthohn that she had never been to the House, although Don had visited on an unknown number of occasions.

15. Witthohn was shown the House on two occasions in November 2021 by Raymond Spaziani, the real estate agent, and received a SmartMLS Matrix listing. Spaziani also confirmed to Witthohn that Defendants had purchased the House intending to move in but had been unable to do so because of Elaine's injuries.

16. On or about November 13, 2021, Plaintiffs signed a four-page Lease ("the Lease"), with an effective date of November 15, 2021, to rent the House.

17. The Lease provided, among other things, that Plaintiffs would pay rent of $5,500 for the balance of November 2021, then would pay monthly rent of $11,000 through November 30, 2023.

18. The Lease also required Plaintiffs to pay a security deposit of $11,000 with the initial rent of $5,500, for a total of $16,500.

19. Almost immediately after moving in, Plaintiffs realized that the House had not been maintained adequately and was not in the condition Defendants had represented and upon which Plaintiffs had relied in agreeing to rent the House.

3

20.    Plaintiffs have recently learned from a neighbor that before Defendants

purchased the House in January 2020, it had been unoccupied "for quite a

long time," then remained unoccupied from the time Defendants bought it

until Plaintiffs moved in.

21.    As a result of its condition, Witthohn communicated regularly and

frequently with Elaine regarding the House and repairs that needed to be

made.

22.    No later than December 10, 2021, Witthohn emailed Elaine with a list of

issues and repairs that included:

- a leak in the garage;

- primary bathroom sink drainage problem;

- interior and exterior infestations of rodents requiring professional
  exterminators;

- a chimney cap that needed to be replaced because it had come loose,
  which not only allowed water to come into the House through the
  chimney and prevented Plaintiffs from using the fireplace in the
  family room but also banged against the chimney in windy
  conditions, which occurred frequently;

- front and back outside water spigots that did not work;

- an HVAC thermostat that did not work because Plaintiffs discovered
  that it was not connected to anything;

- multiple electrical outlets in the family room, living room, and
  primary bedroom that did not work or worked sporadically;

- deficient or deteriorated electrical wiring;

4

- loose or broken tiles in the garage entrance;

- at least three outside doors that were rusted or corroded and did not seal or close properly;

- inadequate or missing insulation throughout the House;

- interior and exterior lights that did not work, including lights for the front porch, garage, and back yard area;

- phone jacks that did not work;

- missing ceiling tiles;

- front doorbell that did not work;

- bar sink and drain in the basement did not work;

- none of the three doors in the second-floor bathroom closed properly or stayed closed when shut;

- downspout on the back of the House was missing; and

- there was a hole in the sliding screen door off the kitchen.

23.    In January 2022, less than two months after Plaintiffs moved in, the first leak developed in the ceiling and walls in the first-floor living room, which forced Plaintiffs to move their furniture and furnishings out of the room so that the leak could be addressed and the drywall and wall repaired and painted. Witthohn had mentioned a water stain on the room's ceiling to Elaine when Plaintiffs moved in, and Elaine told her that it was an old leak that had been repaired.

24.    In February 2022, the second leak developed in the ceiling and walls in the same room days after the patching and painting for the first leak were completed, which once again forced Plaintiffs to move their furniture and furnishings out of the room so that the leak could be repaired, and the room painted for the second time.

25.    The second leak had originated in the roof and/or wood-shingle siding, which required shingles to be removed and replaced, which took several weeks to repair and caused inconvenience and disruption to Plaintiffs.

26.    Throughout the spring of 2022, Witthohn informed Elaine about the condition of the House and continuing necessary repairs and maintenance. Even though Defendants have been landlords for many years and now live approximately 1,400 miles from the House, they did not and do not employ a property manager or another professional, and instead relied on Witthohn to act in that capacity without any compensation.

27.    In fact, Elaine told Witthohn that she had fallen again recently and sustained head injuries, which caused cognitive deficits that prevented her from attending to the House and required her to depend on Witthohn.

28.    As a result of Elaine's claimed impairment, Witthohn had to take time from work to negotiate with contractors and tradespeople and obtain estimates

6

for work, which she would provide to Defendants, who insisted on making the final decision about any repairs.

29.    The parties agreed that, for certain months, Witthohn would retain half the amount of the rent payment ($5,500) in order to be able to pay contractors and tradespeople directly, as most, if not all, of them insisted on being paid when they completed work and would not agree to wait on payment from Defendants, who would have to mail a check from Louisiana.

30.    Witthohn accounted for all monies paid to Defendants, whether in the form of rent or funds she retained with Defendants' agreement.

31.    Starting in the late spring and summer of 2022, as the weather became hotter, the temperature on the House's second floor, where both Plaintiffs maintain home offices (Witthohn is a self-employed literary agent and Mehalic is an attorney in private practice), would routinely reach the 80s-90s, as there was no air conditioning on or reaching that floor. There was and is always at least a ten-degree temperature difference between the basement and the first floor and between the first and second floors, which results in dramatic fluctuations in temperatures and comfort.

32.    Even though the House is nearly 8,000 square feet, including all floors, it has only one HVAC unit, which is clearly inadequate for the size of the

House and resulted in the dramatic swings in temperature that Plaintiffs experienced.

33. The SmartMLS Matrix listing states that the House has "central air," which Raymond Spaziani, the agent who showed the House to Witthohn, also confirmed to her.

34. On April 27, 2021, when Defendants first listed the House for sale, they signed a Residential Property Condition Report, which was part of the packet of information provided to Witthohn when she toured the House, which confirmed that the House has central air conditioning.

35. Plaintiffs understood and believed that "central air" conditioning meant that all floors of the House were air conditioned, either by a central unit or individual units for each floor, given its size.

36. Because Plaintiffs had signed a two-year lease and due to the amount of monthly rent, Plaintiffs asked Defendants to install air-conditioning units on the second floor in order to alleviate the stifling conditions.

37. Defendants agreed to do so and asked Witthohn to obtain bids from contractors.

38. On May 30, 2022, the HVAC unit, which is in the basement, malfunctioned in the middle of the night, causing flooding and damaging or ruining Plaintiffs' property, and requiring four hours of Plaintiffs' time to clean up.

39. Because of issues regarding the replacement and installation of the part in the HVAC unit that had malfunctioned, Plaintiffs were without air circulation or air conditioning for six weeks in June and July.

40. During this period, outside temperatures were routinely in the 80s and 90s and the humidity in the house reached 50-60 percent, causing doors to swell, which prevented them from opening and closing, and papers to curl.

41. Plaintiffs made Defendants aware of the condition of the House and expressed their concern repeatedly that the House was not in the condition represented to them and not worth $11,000 per month and was negatively affecting their use and enjoyment.

42. Consequently, for the months of July and August, Defendants agreed to reduce the monthly rent by 50 percent as a credit for the conditions Plaintiffs experienced.

43. On June 19, Elaine had provided Witthohn with an email from Defendants' insurance agent advising them that their homeowners' insurance carrier had cancelled their policy because an annual inspection performed on March 25, 2022 revealed the presence of "knob and tube wiring," which was not allowed. Elaine asked Witthohn if Mehalic would assist Defendants in contacting the insurance agent.

44.    Mehalic agreed to do so and sent a letter dated June 29 to the insurance agent, which enclosed a letter from an electrician confirming that there was no "knob and tube wiring" in the House.

45.    On July 19, Defendants' homeowners' insurance carrier reinstated their policy as though it had never been cancelled. Defendants did not compensate Mehalic, nor did they offer to do so.

46.    Even after living in the House for several months, Plaintiffs continued to learn that its condition and features were not as represented.

47.    For example, according to the SmartMLS Matrix listing, the House has a heated pool. But when the pool pump needed to be replaced because it did not work, Plaintiffs learned that the pool was not heated.

48.    Further, neither the outdoor shower nor the garbage disposal worked, although Plaintiffs were not aware of the condition of either until after they were living in the House. Nor did the ceiling fans on the second floor work, which meant there was no air circulation whatsoever on that floor, which was oppressively hot and humid.

49.    Plaintiffs continued to experience dramatic temperature swings in the House, as Defendants had not yet proceeded with the installation of an air-conditioning unit for the second floor, even though Witthohn had provided them with three quotes at their request.

50.   Finally, in September, Elaine approved the least expensive of the three quotes, which was from a contractor working with Plaintiffs' next-door neighbor, Gary Salci, who was building a house. The quote was the lowest because the contractor had given Witthohn a discount because of her friendship with Salci, and also included a rebate from the manufacturer that was available for a limited time.

51.   Witthohn had asked the contractor to start as soon as possible, but because Elaine had waited so long in finally approving the quote, he had already started another big job, which forced Plaintiffs to wait. Additionally, the manufacturer's rebate had expired.

52.   During the course of obtaining those quotes, every contractor whom Witthohn contacted and who inspected the House told her that the electrical box on the second floor needed to be upgraded, as indicated by lights that flickered and outlets that stopped working.

53.   Further, Plaintiffs have learned that part of Witthohn's difficulty in finding contractors to provide quotes is that Elaine has a history and reputation of being difficult to work with, not paying contractors the agreed price for their services, or not paying them at all.

54.   On December 12, Defendants had Plaintiffs served with a Notice to Quit, which initiates the eviction process. Witthohn immediately contacted

Elaine by phone, email, and text, and asked why Defendants had served the Notice to Quit. Elaine did not respond for several days.

55.    When she finally responded, Elaine told Witthohn that it was a "life or death situation" and that Defendants had served the Notice to Quit because they had not received any rent payment in January 2022, nor had they received any rent payments since April 2022.

56.    For reasons they did not disclose, Defendants also cancelled any work to be done to the House, including the upgrade to the HVAC unit and wiring on the second floor, which Defendants had agreed several months earlier to make and upon which Plaintiffs had relied.

57.    Witthohn then prepared an audit for Defendants in which she accounted for all amounts Plaintiffs had paid to them and provided a running balance for the retained funds, even though Elaine had already been provided with all the information.

58.    On December 18, one week before Christmas and less than one week since Defendants had served the Notice to Quit, Witthohn provided Defendants with the audit and a three-page letter describing the problems with the House, Defendants' lack of responsiveness and failure to follow through on agreements made with Plaintiffs, and the conditions Plaintiffs had endured while living in the House and continued to endure.

12

59.    Defendants then asked that Plaintiffs pay the retained funds to them, as they determined that they, and not Witthohn, would be responsible for contacting, scheduling, and paying contractors and tradespeople.

60.    Consequently, on January 3, 2023, after Defendants had reviewed the paperwork and found an error in Plaintiffs' favor, Witthohn wired Defendants $16,007.37, which was the entire balance of the retained funds.

61.    Although those funds had been set aside for the HVAC and electrical upgrade to the second floor, which Elaine had canceled, the amount still did not cover the amount of the quote Elaine had originally accepted.

62.    On December 31, a third leak developed in the ceiling and walls of the first-floor living room. Plaintiffs had to move their furniture and furnishings from the room yet again.

63.    On January 1, 2023, Mehalic emailed Defendants and reviewed Plaintiffs' problems with the House, including the HVAC unit and electrical upgrade for the second floor, which Defendants had agreed to make and then unilaterally canceled; the cracked/broken window in a room on the second floor that Witthohn used as her office, which Defendants' contractor measured on March 3, 2022, but which they did not replace until March 24, 2023, more than one year later; the leak (the third one) in the living room; the exterior and interior infestations of rodents; doors that did not close or

lock because they were not hung properly; outside lights that hung off the House with the wires exposed, and an indoor chandelier that needed to be replaced and for which replacement lights had been purchased nearly one year earlier; and the new damper in the fireplace, which did not work.

64.    Mehalic reiterated that Plaintiffs had sustained losses for their time, their use of the House, and their possessions and property as a result of the condition of the House, which Defendants were unable or unwilling to remedy.

65.    Mehalic advised Defendants that Plaintiffs expected a credit for the loss of their time and use of the House.

66.    On January 2, Mehalic and Don spoke by telephone. Don apologized to Mehalic for the Notice to Quit served on Plaintiffs in December and said that "Sometimes she [Elaine] shoots from the hip."

67.    During the same conversation, Mehalic reviewed the email he had sent the day before and reiterated that while Plaintiffs wanted to continue to live in the House, they expected Defendants to make the requested improvements and upgrades, as Defendants had agreed to, particularly because nearly one year of the term of the lease remained. In closing, Mehalic also made clear that Plaintiffs expected a credit in the amount of the rent.

68.    During this conversation, Don asked Plaintiffs to consider moving out in June, when the weather was nicer, rather than at the end of their lease in November.

69.    On or about January 5, Defendants agreed to give Plaintiffs a 50-percent credit in the rent for the months of January and February.

70.    On January 29, Mehalic again emailed Defendants and updated his January 1 email regarding necessary repairs and upgrades, including that:

- a contractor had confirmed that the fireplace damper was frozen shut;

- the exterminator had inspected the attic (which was accessible only from the room Mehalic used as an office, thus requiring him to move furniture and furnishings out of the room to give the exterminator continuing access);

- in 2022 and 2023, Defendants' contractor looked at three outside doors, and both times advised Plaintiffs that the doors could not be repaired and had to be replaced, which the contractor said he had told Don. Because Defendants refused to do so, Plaintiffs had to put towels or newspaper around the bottoms and sides of the doors to keep out cold air;

- the leak in the living room had leaked again—for the fourth time—since the January 1 email and water dripping from the ceiling caused bubbling under the paint on the front wall, thus continuing to deprive Plaintiffs of the use of the room;

- no one from the gas company had shown up, as Defendants had proposed somehow installing a gas line into the House in lieu of the electrical and HVAC unit upgrades they had agreed to make, then canceled; and

- no one had shown up to repair or replace the lights.

71.  On February 3, Witthohn spoke to Elaine by telephone, who informed Witthohn that Defendants wanted Plaintiffs to leave before the lease expired because Defendants were interested in buying property in California and needed the proceeds from selling the House in order to do so and would be unable to sell the House while Plaintiffs lived there.

72.  When Defendants did not respond to Mehalic's January 29 email, he again emailed them on February 15, and reviewed the issues that needed to be addressed, including:

- the status of the HVAC unit and electrical upgrade for the second floor;

- the ongoing leak (the fourth) in the living room (which required Plaintiffs to place plastic on the floor);

- the continuing problem with the three outside doors;

- the same contractor told Plaintiffs that Defendants were aware of the problem with front door not closing or sealing properly because, before Plaintiffs moved in, Defendants had had to replace the flooring in the front hall because water kept getting in under the door, none of which Defendants had told Plaintiffs;

- the exterminator had set traps in the attic, which he would have to come back and check (thus causing Mehalic's office to remain in disarray); and

- no electrician had come to install the new lights and chandelier purchased more than a year earlier.

73.  In the same February 15 email, Mehalic advised that Plaintiffs continued to experience a loss of use and time waiting for Defendants to address these

16

issues, many of which, if not all, had been pending for more than a year and that continuing to adjust the rent (as Defendants had agreed for January and February) was appropriate and necessary until the issues were resolved.

74.    On February 20, Defendants emailed Plaintiffs a letter in which they advised, among other things, that "No HVAC or electrical will be done. This house was built in 1963 and we are not rebuilding it." Defendants also stated advised that "Don said there was nothing wrong with the doors. They are solid wood and were installed when the house was built and all doors close and lock." Defendants also told Plaintiffs to "Put some sticky traps down [in order to catch mice][,]" and that they had cancelled the exterminator.

75.    Defendants informed Plaintiffs that Plaintiffs "have been more than compensated for any inconvenience" by the reduced rent and declined to provide any further credit. Defendants once again agreed to cancel the remaining time on the lease so Plaintiffs could leave.

76.    On February 23, Mehalic emailed Defendants in order to address the errors and misstatements in their February 15 letter, including that:

- no one had shown up to repair the latest leak (the fourth one);

- that the doors needed to be replaced, not repaired;

- that the rodents were in the interior walls and ceilings, not outside; and

- that exterior lights were hanging off the House with wires exposed.

77. Mehalic also reminded Defendants that Plaintiffs could not close off the second floor and that the inadequate system could not cool the entire House efficiently or effectively.

78. Finally, he pointed out that both Defendants had asked Plaintiffs to consider moving out so they could sell the House, which, combined with their offer to cancel the remaining time on the lease and their refusal to make previously agreed-upon repairs and maintenance, demonstrated that Defendants were attempting to force Plaintiffs to move before their lease expired. Mehalic once again asked Defendants to adjust the rent to reflect Plaintiffs' loss of use.

79. On March 1, Elaine emailed Mehalic apparently to respond to his February 23 email and claimed not to know that no one had come to the House to repair the leak (the fourth one); claimed that the doors were working fine before Plaintiffs moved in and that weather stripping would stop any leaks; and asserted that Plaintiffs knew there was no AC on the second floor when they agreed to rent.

80. Elaine also advised that an electrician would be available by March 15 or sooner and that the broken window in Witthohn's office (which was broken

when Plaintiffs moved in, as Plaintiffs had told Defendants repeatedly) would be replaced (the window was replaced on March 24). Elaine claimed that Defendants had stated that Plaintiffs could leave early if they are not satisfied with the condition of the House, not to force them out in order to sell, and that Defendants' move to California was merely speculation by Plaintiffs. She asked for copies of all checks and an itemization of the funds Plaintiffs had retained (even though Witthohn had provided her with this information on multiple occasions, including in December). Finally, she reiterated there would be no rent adjustment.

81.    Mehalic responded on March 1 to Elaine's email to remind Defendants of Plaintiffs' position and that she had told Witthohn that Defendants needed to sell the House in order to buy the property they were looking at in California. Mehalic asked her to keep Plaintiffs informed on the outstanding repairs.

82.    On March 4, the fourth leak on the first floor was worsening, with plaster falling from the ceiling on the floor.

83.    On March 11, a leak developed on the second floor of the House in a room that faced Park Boulevard. The leak, which was the first on that floor but the fifth overall, caused water and plaster to fall from the ceiling onto Plaintiffs' furnishings and floor, and plaster to hang from the ceiling.

84. Witthohn immediately informed Elaine about the fifth leak and provided her with photographs.

85. The leak forced Plaintiffs to put plastic on the floor and to clean and roll up the carpet and clean and move the furniture in that room, thus depriving them of the use of yet another room in the House.

86. On March 13, the roofing contractor put a tarp on the roof until a crew could get to the House to make the repairs.

87. On March 21, a roofing contractor replaced shingles in a limited area of the roof, as Defendants refused to replace the entire roof after the fifth leak, even though that was and is the only way to ensure that there are no further leaks.

88. On April 1, another leak—the sixth—appeared in a different place in the ceiling on the second floor. Witthohn notified Elaine immediately.

89. On April 6, the roofing contractor returned to repair yet another section, as Defendants continued to refuse to replace the entire roof.

90. On May 12, a painting contractor started repairs on the first and second floors where the leaks were located and had damaged the House.

91. The contractor completed the repairs on June 5, meaning that from December 31 until June 5, Plaintiffs were unable to use the large first-floor

living room, and from March 11 until June 6, they were unable to use the large second-floor room.

92. The painting contractor, who was not licensed or bonded, could work only in the evenings or on the weekends, as he had a full-time job, which prolonged the length of the repairs.

93. Because of the frequent and repeated leaks in the living room, Plaintiffs were reluctant to move their furniture and furnishings into the room, only to have to move them again when yet another leak developed. As a result, Plaintiffs were and are deprived of the use of both living areas.

94. Since Plaintiffs moved in and as of this point, there have been six leaks, four on the first floor and two on the second floor. The repair of each one has involved repairing drywall, sanding, and painting, and required Plaintiffs to move and cover any furniture and furnishings still in those rooms with plastic sheets.

95. On June 14, Plaintiffs were served with another Notice to Quit, which alleges the non-payment of rent and gives them until June 20 to quit their possession or occupancy of the House.

96. Defendants did not extend the courtesy to Plaintiffs either in December or in June of asking about the status of the rent payment before causing them to be served with a Notice to Quit.

97.    Had Defendants done so in December, they would have learned that Elaine was mistaken in her apparent belief that Plaintiffs had not paid rent in January 2022 or any rent since April 2022, which presumably would have caused Defendants not to serve the Notice to Quit.

98.    Had Defendants done so in June, they would have learned that Plaintiffs' failure to pay was an oversight on Mehalic's part. Of course, by not contacting Plaintiffs, Defendants were able to file the Notice to Quit, which enables them to initiate the process to attempt to evict Plaintiffs from the House so that Defendants can sell it, as they have long planned.

99.    The timing of the Notice to Quit coincides with Defendants' previously stated desire that Plaintiffs move out in June, ostensibly so Plaintiffs would be moving in warm weather and not cold weather when their lease expires in November, but in actuality so that Defendants can put the House up for sale—thereby benefiting from the more favorable market conditions in the summer—in order to facilitate their move to California.

100.    There has not been a single month since Plaintiffs have occupied the House that they have had the full use and enjoyment of the House, as provided by the Lease.

101.    There has not been a single month since Plaintiffs have occupied the House that a problem or issue has not existed or developed that needed to be addressed.

102.    There has not been a single month since Plaintiffs have occupied the House that they have not been required to accommodate the schedules or one or more contractors.

## Count I
## Breach of Contract

103.    Plaintiffs incorporate paragraphs 1 through 102 by reference as if set forth verbatim hereinafter.

104.    The parties' Lease represents a contract between Plaintiffs and Defendants, which includes an implied warranty of good faith and fair dealing.

105.    Defendants' oral and written representations to Plaintiffs that Defendants would make certain improvements, upgrades, repairs, and/or replacements to the House and/or of its fixtures and systems represent a contract between the parties, which includes an implied warranty of good faith and fair dealing.

106.    Defendants breached their contract with Plaintiffs by failing to honor the Lease.

107. Defendants breached their contract with Plaintiffs by failing to honor their oral and written representations to Plaintiffs that Defendants would make certain improvements, upgrades, repairs, and/or replacements to the House and/or of its fixtures and systems represent a contract between the parties.

108. As a direct and proximate result of Defendants' breaches, Plaintiffs have been harmed and sustained damages.

## Count II
## Detrimental Reliance

109. Plaintiffs incorporate paragraphs 1 through 108 by reference as if set forth verbatim hereinafter.

110. Defendants made representations to Plaintiffs regarding the condition of the House, which were not true or accurate at the time they were made or thereafter.

111. Defendants made representations to Plaintiffs that Defendants would make certain improvements, upgrades, repairs, and/or replacements to the House and/or of its fixtures and systems, which were not true or accurate at the time they were made or thereafter.

112. Plaintiffs' reliance on Defendants' representations was reasonable and foreseeable.

113. Plaintiffs actually and reasonably relied on Defendants' representations.

114.    Plaintiffs relied to their detriment on Defendants' representations.

115.    As a direct and proximate result of Plaintiffs' reliance, they have been
        harmed and sustained damages.

**Count III**
**Intentional Misrepresentation**

116.    Plaintiffs incorporate paragraphs 1 through 115 by reference as if set forth
        verbatim hereinafter.

117.    Defendants made factual representations to Plaintiffs regarding the
        condition of the House, which were untrue.

118.    Defendants knew that their factual representations to Plaintiffs regarding
        the condition of the House were untrue.

119.    Defendants made those representations to Plaintiffs for the purpose of
        inducing Plaintiffs to act upon them.

120.    Plaintiffs acted upon Defendants' false representations and were harmed as
        a result.

121.    Defendants made factual representations to Plaintiffs that Defendants
        would make certain improvements, upgrades, repairs, and/or replacements
        to the House and/or of its fixtures and systems, which were untrue.

122. Defendants knew that their factual representations to Plaintiffs that Defendants would make certain improvements, upgrades, repairs, and/or replacements to the House and/or of its fixtures and systems were untrue.

123. Defendants made those representations to Plaintiffs for the purpose of inducing Plaintiffs to act upon them.

124. Plaintiffs justifiably relied and acted upon Defendants' false representations and were harmed as a result.

125. As a direct and proximate result of Defendants' intentional misrepresentations, Plaintiffs have been harmed and sustained damages.

**Count IV**
**Negligent Misrepresentation**

126. Plaintiffs incorporate paragraphs 1 through 125 by reference as if set forth verbatim hereinafter.

127. Defendants made factual representations to Plaintiffs regarding the condition of the House, which were untrue.

128. Defendants knew or should have known that their factual representations to Plaintiffs regarding the condition of the House were untrue or did not know whether their factual representations to Plaintiffs were true or false.

129. Defendants made those representations to Plaintiffs for the purpose of inducing Plaintiffs to act upon them.

130. Plaintiffs justifiably relied and acted upon Defendants' false representations and were harmed as a result.

131. Defendants made factual representations to Plaintiffs that Defendants would make certain improvements, upgrades, repairs, and/or replacements to the House and/or of its fixtures and systems, which were untrue.

132. Defendants knew or should have known that their factual representations to Plaintiffs that Defendants would make certain improvements, upgrades, repairs, and/or replacements to the House and/or of its fixtures and systems were untrue or did not know whether their factual representations to Plaintiffs were true or false.

133. Defendants made those representations to Plaintiffs for the purpose of inducing Plaintiffs to act upon them.

134. Plaintiffs justifiably relied and acted upon Defendants' false representations and were harmed as a result.

135. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have been harmed and sustained damages.


**Count V**
**Unjust Enrichment**

136. Plaintiffs incorporate paragraphs 1 through 135 by reference as if set forth verbatim hereinafter.

137.  Under the Lease, Plaintiffs have been obligated to pay, and have paid, rent in the amount of $11,000 per month, except for those months that Defendants agreed to reduce the rent by 50 percent.

138.  Defendants have benefited from the payment of rent in the amount of $11,000 per month.

139.  Defendants have refused to reduce Plaintiffs' monthly rent or provide Plaintiffs with a credit against future rent to be paid, despite having been made aware by Plaintiffs of the problems and issues with the House and have refused to resolve those problems and issues or reneged on an agreement to do so.

140.  Defendants' demand that Plaintiffs pay rent in the amount of $11,000 per month, when Defendants have been made aware by Plaintiffs of the problems and issues with the House and refused to resolve those problems and issues or reneged on an agreement to do so, unjustly enriches Defendants.

141.  Defendants' refusal to reduce Plaintiffs' monthly rent or provide Plaintiffs with a credit against future rent to be paid was and is to Plaintiffs' detriment.

142.  Plaintiffs lack an available remedy under the Lease.

143.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have been harmed and sustained damages.

**WHEREFORE**, Plaintiffs Christine Witthohn and Jeffrey V. Mehalic demand judgment of and from Defendants Don Winslow and Elaine Winslow, jointly and severally, in such amount as will adequately compensate them for their losses; pre- and post-judgment interest; attorney's fees and expenses; court costs; and any other relief this Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

/s/ Christine Witthohn
Christine Witthohn
1345 Barnum Avenue, Suite 9, No. 348
Stratford, CT 06614
(203) 664-4044
cwitthohn@gmail.com
*Plaintiff Pro Se*

/s/ Jeffrey V. Mehalic
Jeffrey V. Mehalic
1345 Barnum Avenue, Suite 9, No. 348
Stratford, CT 06614
(304) 346-3462
jeff@mehaliclaw.com
*Plaintiff Pro Se*